May it please the Court, Jay Nelson on behalf of Robert Baker. I'm joined at the Council table by my colleague, Ethan Vallow. I wonder if you'd pick the mic up a little bit. Thank you. I realize I'm expected to watch my own time. I'll do my best to reserve two or three minutes at the end for rebuttal. I'd like to start first this morning with Mr. Baker's Brady claim and then turn to his Fourth Amendment claim. If I have time, I'd like to address the DNA issue as well. Obviously, the Court is hearing the Pool case on Bonk. I don't think that case should have too much effect on the statutory analysis here. But obviously, I'd be happy to address any questions the Court might have. Could you speak a little louder? I know you're too tall for the microphone. Apologies. I'll speak louder. Thank you. Thank you, Your Honor. Now, as for the Brady claim, Robert Baker was a 22-year-old young man and a passenger in a Ford expedition. And he found himself charged in a 10-year mandatory minimum case for distribution and conspiracy. And these allegations arose out of the statements of two CHP officers, Officers Rudder and Russell. And they told the government that on two occasions during the chase up Highway 101, they observed pounds of methamphetamine ejected from the windows of the expedition, so much so that it enveloped the patrol car as if it was a snowstorm in Lake Tahoe, blinding them as they drove for three to five seconds each time. And they also gave you a police report from somebody else who said he saw what he saw, no mention of any blizzard. That's correct, Your Honor. And this guy comes and testifies that, sure enough, he didn't see any blizzard. That's correct, Your Honor. Where's the problem? The problem, Your Honor. Your client was acquitted. I mean, the other piece of that is he's acquitted of the charge that is related to that. He was acquitted of both counts of the indictment, Your Honor. Right. And it's true that it's likely a large part of the result of Deputy Thompson's testimony that he did not see the snowstorms come out of the expedition. Which was learned from material disclosed to your client. Not correct, Your Honor. The police report was silent on the question of whether he saw anything come out of the expedition or not. And that's a far cry from his affirmative statement to the prosecutors that he did not see anything come out of the expedition. There could have been any number of reasons why there was no reference to anything coming out of the expedition in the police report. So that's why it was new information. Okay. Even if he – it's not enough that they disclosed what he saw, that they supposedly had to disclose what he didn't see. Leaving that aside, the officer took the stand and testified to what he didn't see. Correct. Now, what would you have us do then? Well, Your Honor, the problem here is that given the government's response to Mr. Baker's Brady claim, which is to deny that Deputy Thompson's statements were even Brady material to begin with. Let's suppose they were Brady material. The guy did testify at the trial on your client's behalf. Correct. Okay. I don't see what harm there was, even if the judge's analysis was wrong. And I'm not saying it was. But even if it was, the information that you say that was concealed did, in fact, come out at trial. Correct. The problem is we don't know what else is out there. The government's response in this case is that – Well, then you lose. I mean, then you have to show what else was out there. If you can't prove it, if all you had was what was – you know, what the officer didn't see, and if what the officer didn't see came out, and if that's all you have, I don't see how you can win. I disagree, Your Honor. The problem here is that the government has demonstrated a fundamental failure to understand its Brady obligations. Deputy Thompson's statements were material, and they were suppressed. And the government's response to that was, this is not even Brady material, and we didn't suppress it. On both counts, they're wrong. Suppose they're wrong. Suppose they're wrong? Yeah. I mean, let's assume they're wrong. Let's assume you're right, they're wrong. There's at least two problems. The stuff you wanted to come out did, in fact, come out. What we would like to come out, and what should come out in every criminal case, is every ounce of exculpatory or impeachment evidence available to the prosecution. Now, do you have any evidence that anything else that was exculpatory did not come out? That's exactly the problem here. My question to you is, do you have any evidence that anything else that was exculpatory did not come out? No, Your Honor. And the problem here is that there very well could be, but that the government has demonstrated a misunderstanding of Brady such that they apparently don't recognize Brady when they see it. Deputy Thompson's testimony cuts at the heart of the case. If Deputy Thompson's statements weren't Brady material, then nothing is, I would submit to the Court. And so when they tell the Court this wasn't even Brady, how do we know that there's nothing else out there? There were 12 other witnesses on the government's witness list, as well as Mr. Baker's co-defendant, Danny St. Nicholas. What other statements did these people make to the government? Did they write any other reports that the government has that we don't have? What Brady case can you cite that allows the kind of speculation that you're now suggesting as a demonstration of harm? I mean, I guess because of the acquittal on those counts, I find it difficult to see any harm anyway. But are there any cases that support the idea that you can guess at what might else ñ what else might have been there when there's no evidence that there was anything  else? Well, Your Honor, the Cajoyan case authored by Judge Kaczynski tells us that when we have a fundamental failure on the part of the government, not only to recognize Brady when it seems to be ñ What case are you referring to? Cajoyan, Your Honor, which we cited in our brief. Judge Kaczynski tells us there that it's appropriate in cases of serious Brady violations to look outside the case. Those are paraphrasing his words, but he says, look outside the case and look to concerns that are bigger than what ñ concerns, for example, related to deterrence of future misconduct of this nature. And so that's what we have here. We have a Brady violation that's been vetted on appeal through the appellate department, and they maintain the same position regardless of how many lines of supervision the case has gone through. This wasn't even Brady material. It wasn't suppressed. We didn't do anything wrong, which is not correct. And so there's a fundamental problem here, and it requires a strong response from this Court to tell the U.S. Attorney's Office ñ Kagan, as I recall, involved an outright lie, not a ñ not a losing argument. Do you have any case in which the government takes what turns out to be a losing argument but doesn't flat-out lie, where there's even a suggestion that dismissal of the whole case is the proper remedy? I'm thinking, Your Honor, of the Corian case where I don't believe there were any outright lies. And the Court addressed the issue of dismissal and found in that case that because the government had taken steps, had demonstrated some contrition, that dismissal would not be appropriate, which I'd submit to the Court, as I did in the 28-J letter I submitted, that that's the opposite situation that we have here. And the situation ñ this is a situation where the Court should send a message to the U.S. Attorney's Office and to the district court that it takes Brady very seriously and that when there's a Brady violation, it's such an obvious Brady violation, it has to be disclosed to the defense. It can't be suppressed. The government's responsibility in a criminal case is unique. Their job is to seek justice, not just to seek victories. And unless the Court sends a clear message to the Court reminding them of that duty in a situation like this where they clearly have failed in that responsibility, I submit to the Court then that it will have a ñ it will permit the conduct to continue. And I would ask the Court not to sanction that result. Now, if I could, then, I'd like to turn to Mr. Baker's Fourth Amendment claim. Here, the suspicion of the search condition we submit is unreasonable under the Fourth Amendment. Now, the question is whether it's reasonable to take a person such as Mr. Baker who's convicted of a minor misdemeanor offense, simple possession of a controlled substance, and subject him to the awesome deprivation of liberty associated with the suspicion of the search condition, subject him to searches anytime, anyplace, anywhere, for any reason at all or no reason whatsoever. And the answer to that question has to be no. And we're not riding on a blank slate here because the Supreme Court has told us in Knights and Sampson that the answer lies in the difference between probationers and parolees. Now, parolees, on the one hand, they've been convicted of very serious offenses. First, they've been sentenced to time in custody, and they generally have a higher rate of recidivism, and they generally pose a greater risk to society upon release. And so the Supreme Court has told us parolees have no expectation of privacy while they're on parole. But probation is different. Probationers stand on a much different footing. They have a lower risk of recidivism. They've been convicted of less serious crimes. They've been released back into society without a custodial sentence. And that's why the Supreme Court has told us they have a reduced expectation of privacy. Kagan, what case are you referring to? Knights, Your Honor. Reduced expectation of privacy, but an expectation of privacy nonetheless. And the requirement of reasonable suspicion advanced by Mr. Baker would give effect to this distinction drawn by the Supreme Court by reducing Mr. Baker's expectation of privacy on probation below the constitutional default of probable cause, but also allowing him to retain some expectation of privacy by way of a requirement of reasonable suspicion. So for that reason, we submit that a requirement of reasonable suspicion flows naturally from the Supreme Court's precedent. And that's the case. What do you make of our case of Sanchez v. Canales? That case, Your Honor, in which the Court held that there's no difference between probation and parole for Fourth Amendment purposes. My understanding, Your Honor, is that that statement is inconsistent with Supreme Court precedent, and it doesn't control it. Well, it is. The awkward problem that we appear to face, and maybe both counsel can address this, we have a general rule that we are, as a three-judge panel, we're bound by any prior three-judge decision that's published from our own circuit, whether it's right or wrong. And the exception to that is intervening authority from the Supreme Court or from the en banc court. And the problem sort of conceptually, to me, is that Sanchez comes after Sampson and Knights, so they're not intervening. So it seems to me that what you're really saying is that Sanchez was wrongly decided, and it might be, but aren't we bound by it? No, Your Honor. That's not an issue that's been briefed, so I'm speaking off the top of my head, obviously. But I would ask the Court to follow the Supreme Court's holdings. Well, we have a rule of our own that is binding on us that we have to follow our own And in this case, we have an application or interpretation of the very cases that you want us to rely on that goes counter to what you're saying and may indeed be wrong. But aren't we – I mean, I guess I just don't see a way for us to not follow what Sanchez said and did. Well, Your Honor, I'd have to give that some thought, and perhaps the Court would But my instinct is to respond that what the Supreme Court precedent controls. And if Sanchez is wrongly decided, then the Supreme Court has told us that. And it's within the Court's discretion to recognize that. Thank you very much. We wanted to reserve some time. Thank you, Mr. Nelson. Good morning. Good morning, Your Honor. May it please the Court, my name is Susan Gray and I represent the United States. Could you pull the microphone down towards you? Thank you. Is that any better, Your Honor? Perfect. I'd like to first address the Brady issue raised by Mr. Baker and his counsel, and then move on to the two probation conditions imposed by Judge Breyer as a very considered imposition of sentence that he imposed in this case. As this Court correctly pointed out, nowhere in the defendant's briefs has he been able to articulate the prejudice that occurred because of if there was a Brady violation or that there was a suppression, even if the Court agreed that there was a Brady violation or that there was a suppression. And I would submit that neither of those occurred here. But the key element missing in this particular case is that there was no prejudice. The facts show that the report was given to the defendant two months before trial, and in that report, which, by the way, is in the record, although not in the excerpts of record, at CR 109-4, that's Exhibit D, the report and the letter, discovery letter that was given to counsel back in October, two months before trial. And that report details what Officer Thompson saw. There's no mention that he saw drugs, no mention that he saw anything being thrown from the car. A week before that, a week before the trial, he essentially told the prosecutors the same thing, I didn't see anything. He specifically told them, I didn't see a bag thrown out of the car. Now, when you look at the record, there's nothing in there that says that it specifically tells us what he told the prosecutors, other than at the conclusion of Mr. Balos' direct, he said, is this exactly what you told the prosecutors the week before you met with the trial? And he says, yes, I confirmed it. So when he talked to the prosecutors, he confirmed what was in that report. Therefore, it wasn't contradictory. It was not exculpatory. It was the report had put the defendant on notice that Officer Thompson had not seen anything. More importantly, during the opening, we know that Thompson, that the defendant was fully aware that Officer Thompson did not know, see anything, because Mr. Nelson told the jurors that in opening at the excerpt of record 238 or at SER 43, he got up and he told them, Deputy Thompson will not tell you he didn't see anything come out of the car, no bags, no powder, no snowstorm. He was then called by the defense. And the defendant was able to fully explore exactly what he had seen and what he did not see. And what came out also, though, during the cross was he didn't see anything because he was approximately 300 to 600 feet behind a car that was going 75 to 100 miles an hour in the middle of the night in Orion County. And so he he there was a good explanation for why he didn't see anything. And the fact that he was traveling at speeds of 75 to 100 miles an hour was in that report. Let me shift gears for a second, if you don't mind. I'm having a hard time figuring out how in any way, shape or form we can uphold the DNA term. Your Honor, let me turn to that. If the Court has no questions on the Brady issue or the search issue. The Court, we did submit a 28-J letter. Right, for Diamond, which is an unpublished decision holding that there's no way, shape or form to uphold this DNA condition. Your Honor, the interesting thing about the Diamond case, of course, it is not controlling, as the Court has noted. But why isn't it right and why isn't the same thing have to happen here? Well, Your Honor, if the Court will allow me, I'd like to just walk us through the statute. And I think that it bears a close examination. For the sake of brevity, I'll just call it the statute rather than cite to it. But it states in that first sentence, the Attorney General may. Okay. Well, start right there. Who's not the Attorney General involved in this case, is it? It's the probation officer. Right. And that's not the Attorney General. Well, Your Honor, he also may authorize and direct any other agency that arrests. And where did the Attorney General authorize the probation department? If you looked at 28.12b, he also authorizes. Doesn't it deal with people in custody? Not under the regulation, Your Honor. I'm talking about under the statute. Your Honor, that – I would submit that that's a heading and that it's not heading. But we have – the Supreme Court has held that the heading of a statute may be used to – and should be used to help interpret its meaning if the meaning is not otherwise clear. But even if you don't look at that, Section A.1 deals with, by text, individuals who are arrested, facing charges, or convicted, whereas Subsection 2 deals with each individual who is or has been convicted of a qualifying offense and is on probation, parole, or supervised release. So that's at least more specific to this individual's situation, because it's a condition of supervised release. So why don't we look only – why aren't we supposed to look only at Subsection 2 and then thus to the definition of qualifying offense? Your Honor, as we set forth in our brief, and our position has not changed, that Section 2 is the bare minimum of what a probation officer could test. But that with the amendment of the statute in 2006, the – clearly from Senator Kyle's remarks, the intent was to expand the DNA testing to individuals who had simply been arrested, were unsupervised – were being supervised or convicted of any Federal crime. There is no limitation on that. Now, I understand that it is in Section A, but our position is that by then referring that authority over to the Attorney General in Section B, he specifically makes clear that it is only – it is to any agency that arrests – arrested, facing charges, or convicted, and that the intention was, when Congress went in and amended that portion of the statute, to expand it even more. So when you – when it says this pertains to individuals in custody, you don't interpret that to mean that it's limited to people in custody? In a perfect world, Your Honor, Congress, when it amended the statute in 2006, would have perhaps put the enlargement of the Federal offenses. Well, they do. See, but that's – the next section deals with people like our guy, who is on release, parole, or probation. So they deal with this situation, but they limit it to certain offenses. But what they did, Your Honor, is they went in and they amended A. Except the – I have another problem with your position as well. And if you'll look over to subsection E of the statute that is entitled Regulations, it has two sections also, and it – and it allows the Attorney General to promulgate regulations except as provided in paragraph 2. And paragraph 2 deals specifically with probation officers, and somebody different makes the regulations for probation officers. So to the extent that the Attorney General is trying to encompass probation officers, isn't that ultra vires of what the statute allows? Your Honor, we read this differently, in that the E1 talks about the pregnancy regulations prescribed by the Attorney General, but it leaves in place the administrative office of the United States courts' ability to go ahead and use their own procedures to carry out the particular DNA testing. The probation officers have that responsibility, obviously, before the amendment. And I believe that this particular portion of the statute is aimed at allowing them to continue that – those procedures. But we do not read E as a limitation on the ability of the Attorney General to prescribe these regulations. Well, if you were to read it that way, it would be exactly parallel to what, at least to me, seems obvious from Part A, which is that there's one section for people who are in custody, and the Attorney General deals with that. Then there's another section for those who are under the aegis of the probation office. That's Part 2. And they have their own set of procedures, and they have to be convicted of a qualifying offense. And it seems to me precisely parallel if you – you know, that there's one set of rules for probation, and there's another set of rules for other people. Your Honor, we respectfully disagree. And I don't have anything to add other than the argument that we've made in our brief. We continue to believe that the Attorney – that Congress, through the amendment to Section A, sought to expand the DNA testing to those convicted of any Federal offense. Wouldn't that render 2 with the requirement of having a qualified offense? Wouldn't that render it meaningless? No, Your Honor. It simply establishes the baseline. 2 is the baseline, and A – So under your view, anybody convicted of any crime can have the DNA taken, and under B, where it says it has to be a qualifying offense, that just means something we're not sure. It is the structure that was in place prior to the 2006 amendment. And our position is when the amendment went through in 2006, Congress chose to expand the testing authority through Section A rather than through B. Okay. That, Your Honor, any other – if the Court has no more questions or has any questions on this search provision? Judge Linden, Judge Griever. No, no more questions. Thank you, Your Honor. Mr. Nelson. Thank you. With respect to the Brady claim and the import of the police report, I think if there's any doubt about what the police report meant to the parties, poor Deputy Thompson gave his statements to the government. I think that's resolved by the government's own actions. Before the government spoke personally with Deputy Thompson, the government thought Deputy Thompson was a good witness for them, that he supported their case, and that's why they had him on the witness list. But after they talked to him, they realized he wasn't a good witness for them, and so they took him off the witness list. And that speaks volumes about what the report meant and what the report meant to the parties at the time that he had it. And that informs us that the report was a different – was different evidence than his affirmative statement that he didn't see any snowstorms. And it was the affirmative statement that was the change in the landscape that the government was required to disclose to Mr. Baker. Now, in terms of prejudice, the prejudice, as I mentioned before, stems from the question of what else remains out there. And it's important to remember that Mr. Baker, because we're here, was convicted of possession of methamphetamine. And so the problem with the government's approach to Brady in this case pervades Mr. Baker's conviction on his possession – conviction for possession. And so why? Because we don't have – we can't have faith that this United States Attorney's Office has disclosed any evidence that could possibly have exculpated Mr. Baker with respect to possession. For example, Mr. Baker had a co-defendant, Danny Sandnicholas, who was in the car as well. Maybe Mr. Sandnicholas told the government that the methamphetamine was his, completely absolving Mr. Baker of any responsibility for the possession offense. So you're arguing that, assuming the Brady violation, that we should just assume willy-nilly with no evidence whatsoever that there must be other Brady violations? Assuming the Brady violation and assuming – and understanding the problems with the government's response, which was this wasn't even Brady material. The problem is the government doesn't know Brady when it sees it, and it requires the Court to tell it, think harder about Brady, train the line assistants about Brady, learn the rules. And follow them. And that's the problem in this case. And it pervades Mr. Baker's possession conviction, and that's what that's going to be. Kagan. But you have nothing but guesses as to any other evidence or any other evidence. So what you really want to do is just punish the government by giving your client a windfall when there is not the slightest bit of evidence that there's any other problem. It's not about punishing the government, Your Honor, or about giving Mr. Baker a windfall. It's about ensuring the integrity of the justice system and making sure that the process works right. And the process didn't work right here, and we're asking the Court to remedy that. Thank you. Ms. Gray, thank you. The case is argued and submitted. We'll stand at recess for this session.
judges: Silverman, Graber, Cjj Lynn (N. Texas), Dj